# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**JEFFREY D. STANTON**
Logansport, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW FALK**
Deputy Attorney General
Indianapolis, Indiana



FILED

Apr 29 2014, 9:41 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| J.K., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 66A03-1306-JS-220 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

## APPEAL FROM THE PULASKI CIRCUIT COURT
The Honorable Michael A. Shurn, Judge
Cause No. 66C01-1203-JS-1

**April 29, 2014**

**OPINION - FOR PUBLICATION**

**ROBB, Judge**

## Case Summary and Issue

J.K. appeals the juvenile court's adjudication of J.K. as a delinquent based on acts of illegal possession of alcohol, illegal consumption of alcohol, and aiding illegal consumption of alcohol. He raises one issue for our review: whether the trial court admitted evidence against J.K. in violation of his rights under the Fourth Amendment to the United States Constitution, where law enforcement officers entered J.K's curtilage, conducted a knock and talk lasting approximately one hour, and entered the residence without a warrant. Concluding the officers' entry onto J.K.'s curtilage, their lengthy knock and talk, and eventual residential entry were unreasonable searches under the Fourth Amendment, we reverse.

## Facts and Procedural History[1]

In the early hours of December 22, 2011, the Pulaski County Sheriff's Department received a complaint regarding a disturbance in the vicinity of Decker Drive in Winamac, Indiana. The complainant informed law enforcement that a number of juveniles were pushing a shopping cart through the neighborhood, making noise, and causing dogs to bark. Winamac Police Department Officers Brian Gaillard and Mark Hoffman were dispatched and arrived at J.K's residence at approximately 1:11 a.m. Shortly after, Pulaski County Sheriff's Department Reserve Deputy John Haley arrived on scene. The officers observed several vehicles parked outside the residence, one of which was a pickup truck with a shopping cart in the bed of the truck. The officers suspected the cart had been stolen from

---

[1] We heard oral argument in this case on March 7, 2014 at DePauw University. We commend counsel for their advocacy and thank the faculty, staff, and students at DePauw for their participation and hospitality.

an Alco store, which was approximately a mile away. A check on the truck's license plate revealed that the truck belonged to a person who Officer Hoffman knew lived elsewhere.

Officer Hoffman knocked on the front door. In the meantime, Officer Gaillard and Officer Haley went through the yard around either side of the residence to ensure that no one attempted to flee from a back exit. No one answered the door, but Officer Hoffman observed persons moving around inside and peeking through the blinds. When Officer Haley entered the back yard and approached the back door, he was able to see through a window and observed over a dozen empty beer cans and wine cooler bottles on the kitchen counter. Officer Haley went to the front to inform Officer Hoffman of the empty alcohol containers, and when he returned to the back of the house minutes later, he discovered that someone inside the residence had removed the cans and bottles from view.

After ten or fifteen minutes without a response from the occupants, Officer Gaillard called for a tow truck to impound the pickup truck that contained the shopping cart. For an additional forty minutes after calling for the tow, the officers remained on the front porch and in the back yard. Officer Hoffman continued to knock at the front door and yell inside, instructing the occupants to answer the door and telling them the truck would be towed. Officer Gaillard spoke on the phone with a deputy prosecuting attorney, who told him not to impound the pickup truck. The tow truck arrived at 2:04 a.m., before Officer Gaillard had an opportunity to cancel the tow.

Upon arrival of the tow truck, seventeen-year-old T.T., who owned the pickup truck, opened the front door of the residence and stepped outside. T.T. exhibited signs of intoxication, including slurred speech and an odor of alcohol. The officers told T.T. to

3

retrieve the owner of the residence, and J.K., also seventeen years old, came to the door. J.K.'s eyes were bloodshot. When J.K. came to the door, he was on the phone with his mother, who owned the residence. J.K.'s mother was over an hour away but was on her way home. Officer Gaillard spoke with J.K.'s mother, and the officers then entered the residence without a warrant and before J.K.'s mother arrived at the home.

The officers performed a search of the residence and found additional evidence of underage drinking, including a number of alcoholic beverage containers. Additional persons found in the residence were all under the age of eighteen, and several of them had alcohol on their breath.

On March 6, 2012, the State filed a delinquency petition, alleging J.K. committed illegal possession of alcohol, illegal consumption of alcohol, and aiding illegal consumption of alcohol, all Class C misdemeanors.

J.K. filed a motion to suppress, and a hearing was held on that motion on November 26, 2012. On December 24, 2012, the trial court issued an order denying J.K.'s motion to suppress. Specifically, the trial court concluded the officers' entry into the residence was justified under the "protective sweep exception" to the Fourth Amendment's warrant requirement. Appellant's Appendix at 18. Furthermore, the trial court noted that there was conflicting testimony given as to whether J.K.'s mother gave consent to enter the residence, but the trial court did "not need to reach any conclusion in relation to consent." Id.

A fact finding hearing was held on March 6, 2013, and J.K. was found to be a delinquent child. J.K. filed a motion to correct error, which the trial court denied. On May 20, 2013, the trial court entered its dispositional order. This appeal followed.

4

## Discussion and Decision

J.K. argues that evidence was admitted at his fact finding hearing in violation of his rights under the Fourth Amendment to the United States Constitution. Three warrantless entries merit discussion in this case: (1) entry onto J.K.'s curtilage by Officer Gaillard and Officer Haley; (2) the nearly hour-long span during which the officers remained on J.K.'s front porch and yard, knocking and yelling into the house; and (3) the officers' entry into J.K.'s residence. We will address each of these warrantless entries below.

### I.   Standard of Review and the Fourth Amendment

Because J.K. brings this appeal following his fact finding hearing, rather than as an interlocutory appeal of the denial of his motion to suppress, we review this appeal as a challenge to the trial court's admission of evidence at the fact finding hearing. Clark v. State, 994 N.E.2d 252, 259-60 (Ind. 2013). A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. Young v. State, 980 N.E.2d 412, 417 (Ind. Ct. App. 2012). A trial court abuses its discretion when its decision is clearly against the logic and effect of the facts and circumstances or when the trial court has misinterpreted the law. Id. The constitutionality of a search is a question of law, which we review de novo. Kelly v. State, 997 N.E.2d 1045, 1050 (Ind. 2013). Similarly, determinations of reasonable suspicion and probable cause are reviewed de novo. Myers v. State, 839 N.E.2d 1146, 1150 (Ind. 2005). When a defendant challenges a warrantless search, it is the State's burden to prove the search fell within an exception to the warrant requirement. Clark, 994 N.E.2d at 260.

The Fourth Amendment to the United States Constitution guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

It is a basic principle of Fourth Amendment law that "searches and seizures inside a home without a warrant are presumptively unreasonable." Kentucky v. King, 131 S.Ct. 1849, 1856 (2011) (citation omitted). In addition, the Supreme Court has held that the curtilage— the area "immediately surrounding and associated with the home"—is "part of the home itself for Fourth Amendment purposes." Florida v. Jardines, 133 S.Ct. 1409, 1414 (2013) (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)). Thus, warrantless entry onto one's curtilage is also presumptively unreasonable. However, the Court has said that this presumption may be overcome because the "ultimate touchstone of the Fourth Amendment is reasonableness. Accordingly, the warrant requirement is subject to certain reasonable exceptions." King, 131 S.Ct. at 1856 (citations and quotation marks omitted). Among these recognized exceptions is the existence of exigent circumstances. Id. In this appeal, it is the State's position that the officers' warrantless entries onto J.K.'s curtilage and into his home were justified by exigent circumstances.[2]

---

[2] In denying J.K.'s motion to suppress, the trial court stated the officers' entry into the residence was justified as a protective sweep. However, context indicates that the trial court likely meant exigent circumstances, and the protective sweep doctrine would not justify the officers' warrantless entry in this case. Compare Maryland v. Buie, 494 U.S. 325 (1990) (discussing protective sweep doctrine) with Brigham City, Utah v. Stuart, 547 U.S. 398 (2006) (discussing exigent circumstances exception to warrant requirement). On appeal, the State does not argue the protective sweep doctrine applies.

6

## II. Curtilage Entry

First, J.K. argues Officer Haley and Officer Gaillard's entry onto J.K's curtilage, particularly his back yard, violated the Fourth Amendment. The State maintains the officers' entry onto J.K.'s curtilage was reasonable and justified by exigent circumstances.

As an initial matter, law enforcement officers are not strictly prohibited from entering a person's curtilage. It is generally accepted that law enforcement officers enjoy a limited invitation to approach a home through ordinary routes of ingress and egress open to visitors. See Jardines, 133 S.Ct. at 1415-16. Officers who are not armed with a warrant may knock on a door and request to speak with an occupant. Id. "This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Id. at 1415. During such an occurrence, "the occupant has no obligation to open the door or to speak." King, 131 S.Ct. at 1862.

Conduct that occurs on one's curtilage that is beyond a traditional "knock and talk" is subject to Fourth Amendment protection. The Supreme Court has provided that determining the extent of a home's curtilage should be done with reference to four factors: (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by. United States v. Dunn, 480 U.S. 294, 301 (1987). With those factors in mind, we must determine whether "the area in question is so intimately tied to the home

7

itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id.

Those portions of J.K.'s property on which Officer Haley and Officer Gaillard intruded, including the sides of the house and the back yard, are curtilage under the protection of the Fourth Amendment. This area was immediately adjacent to J.K.'s home, and Officer Haley was only a few feet away from the house and back door. Testimony indicated that the front door was the common means of access to the house, and the back door was "never" used to enter the house. Transcript at 321. There was no evidence of a sidewalk or other means of ingress or egress that would indicate the sides and back of the house were open to visitors. Moreover, the owners of the residence had taken steps to secure privacy in this area: the back yard was enclosed by a privacy fence and a row of pine trees. When Officer Haley and Officer Gaillard left the front door and walked around to the back of the house, they were "no longer in a place where visitors could be expected to go." See Divello v. State, 782 N.E.2d 433, 439 (Ind. Ct. App. 2003), trans. denied.

The State's reliance on Traylor v. State, 817 N.E.2d 611 (Ind. Ct. App. 2004), trans. denied, is misplaced.[3] In Traylor, this court held that officers who approached the front and rear doors of a mobile home during an investigation were in places where visitors of the mobile home would be expected to go. Id. at 616. Whether a portion of the curtilage is open to visitors is a fact-specific inquiry. See Dunn, 480 U.S. at 300-03. Contrary to the State's apparent interpretation, Traylor does not stand for the proposition that the back

---

[3] The State also cites VanWinkle v. State, 764 N.E.2d 258 (Ind. Ct. App. 2002), trans. denied, which the court in Traylor described as having "identical" facts. Traylor, 817 N.E.2d at 616.

yard and rear entry to every home in Indiana are open to any stranger who happens upon them.

The State argues that the entry onto J.K.'s curtilage, if otherwise impermissible, was justified by exigent circumstances. Specifically, the State maintains the officers' entry onto J.K.'s curtilage was necessary to guard against fleeing suspects. Indeed, "[p]olice officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect." King, 131 S.Ct. at 1856 (citing United States v. Santana, 427 U.S. 38, 42-43 (1976)). Hot pursuit of a fleeing suspect has been recognized as a circumstance where "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (citation and quotation marks omitted). Contending that such an exigency existed, the State cites two cases: Snellgrove v. State, 569 N.E.2d 337 (Ind. 1991) and Hardister v. State, 849 N.E.2d 563 (Ind. 2006). Neither case truly supports the State's argument, and no exigency existed such that it was necessary for the officers to enter J.K.'s curtilage.

In Hardister, officers received an anonymous tip that two persons armed with guns were "cooking drugs" at their residence. 849 N.E.2d at 568. The officers went to the front porch and knocked on the door. Id. Two men appeared at a window near the door and made eye-contact with the officer who knocked. Id. The officer flashed his badge, identified himself as a police officer, and asked the suspects to open the door. Id. Then, the officers heard running and saw the two men fleeing to the rear of the residence. Id. Believing the men were attempting to escape, the officers followed a sidewalk around the

9

side of the house to the back door. Id. The court in Hardister held the officers' warrantless entry onto the curtilage was justified by their reasonable belief that they were in pursuit of suspects attempting to flee from the back of the residence. Id. at 572.

The facts in Hardister and this case are worlds apart.[4] Here, the officers did not witness anyone running toward the back of the residence. In fact, Officer Haley and Officer Gaillard did not even know whether there were persons inside the residence before they entered the back yard. There was no objective evidence indicating that anyone was fleeing from the back of the residence.

Additionally, the Supreme Court has said that "some element of a chase will usually be involved in a 'hot pursuit' case." Santana, 427 U.S. at 42 n.3. Officer Haley and Officer Gaillard's encroachment onto J.K.'s curtilage—to guard against the possibility that someone may attempt to flee, without any evidence to support this belief—did not involve an element of a chase.

In sum, the officers' warrantless entry onto J.K.'s curtilage was not justified by exigent circumstances. Therefore, we conclude that entry violated J.K.'s Fourth Amendment right to be free from unreasonable searches. Thus, evidence obtained as a result of that violation—namely, the sight of empty alcoholic beverage containers—and any suspicion resulting from that evidence is tainted and subject to the exclusionary rule. Wong Sun v. United States, 371 U.S. 471, 484-85 (1963).

---

[4] Snellgrove is also no help to the State. There, the court held that a warrantless entry into the defendant's home was not justified by exigent circumstances. Snellgrove, 569 N.E.2d at 341. Specifically, the court found there was "no evidence in the record . . . that supports the State's assertion that appellant was likely to take flight to escape arrest." Id. In that sense, Snellgrove is similar to the present case.

III. Knock and Talk and Unlicensed Physical Intrusion on Protected Curtilage

Next, J.K. contends the officers in this case violated J.K.'s Fourth Amendment rights by engaging in an unconstitutional knock and talk. J.K. maintains that the officers' presence at the home and continually knocking for approximately one hour without an answer from an occupant exceeded their implied invitation to knock and talk. See Jardines, 133 S.Ct. at 1415-16. Essentially, we consider whether conduct that may begin as a valid knock and talk may devolve into an unlicensed physical intrusion on a protected area, resulting in an unconstitutional search. See id. at 1415-18; see also United States v. Jones, 132 S.Ct. 945, 949-53 (2012) (holding a physical intrusion—or "trespass"—on protected property may constitute an unconstitutional search).

This is an interesting issue, but it is one on which there is little binding authority. The Supreme Court in Jardines described the implied invitation to knock and talk as the license to do "no more than any private citizen might do." Jardines, 133 S.Ct. at 1416 (citation omitted). As noted above, this limited invitation "permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Id. at 1415 (emphasis added). This statement implies that a failure to leave after a brief period exceeds the implied invitation to enter one's curtilage and would violate the Fourth Amendment. Indeed, Jardines held that law enforcement's use of trained drug dogs on the defendant's front porch violated the Fourth Amendment; that holding is based on the idea that such conduct was not encompassed by the implied invitation to approach portions of the curtilage. Id. at 1416-17.

11

Discussing the law enforcement's unconstitutional search in <u>Jardines</u>, the Supreme Court explained how a conventional knock and talk may be distinguished from an unconstitutional search and that the nature of the police conduct is central in determining whether that conduct conforms to social norms:

> An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police. The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose.

<u>Id.</u> at 1416 (footnote omitted).

Further, it is well-established that "the occupant has no obligation to open the door or to speak." <u>King</u>, 131 S.Ct. at 1862. "When the police knock on a door but the occupants choose not to respond or to speak, the investigation will have reached a conspicuously low point . . . ." <u>Id.</u> (citation and quotation marks omitted). Additionally, the Indiana Supreme Court has stated that "[i]f residents exercise this right, officers generally must leave and secure a warrant if they want to pursue the matter." <u>Hardister</u>, 849 N.E.2d at 570.

With these principles in mind, we must conclude that the officers' conduct was an unconstitutional search in violation of the Fourth Amendment. The officers' actions in this case extended well beyond the implied invitation to approach a citizen's front door. The officers surrounded J.K.'s residence around one o'clock in the morning and repeatedly knocked on the door for over forty-five minutes. During that span of time, the officers peered through the windows and continuously yelled into the house demanding that an occupant answer the door. The Supreme Court has said officers may "approach a home

12

and knock, precisely because that is 'no more than any private citizen might do.'" Jardines, 133 S.Ct. at 1416 (quoting King, 131 S.Ct. at 1862). There is no doubt that the officers' conduct in this case went far beyond anything that would ordinarily be expected to occur on one's doorstep. If three men with guns and flashlights were to surround the average person's home in the wee hours of the morning, knock for over forty-five minutes, and yell inside demanding the occupants open the door, this situation would—like the Court noted in Jardines—inspire that homeowner to call the police.

Setting aside the officers' conduct while on the curtilage, the length of time the officers remained there would alone constitute a violation of the Fourth Amendment. The officers knocked but did not receive an answer, ostensibly because the occupants chose not to answer. At this time, the officers' investigation reached a "conspicuously low point." King, 131 S.Ct. at 1862. But rather than vacate J.K.'s curtilage and attempt to obtain a warrant,[5] the officers simply remained on the curtilage for an additional forty-five minutes. This is not permitted under the Fourth Amendment.

> [W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity . . . .

---

[5] The trial court found "the officers on the scene had access to the deputy prosecuting attorney at all times and never requested a search warrant to enter the residence." Appellant's App. at 18.

13

Jardines, 133 S.Ct. at 1414 (citation and quotation marks omitted). When a Hoosier exercises his constitutional right to remain inside his home, law enforcement may not pitch a tent on the front porch and wait in hopes of obtaining evidence.

Finally, the circumstances of this case present no exception to the warrant requirement (e.g. exigent circumstances) that would otherwise justify the officers' decision to remain on J.K.'s curtilage. For the duration of the time the officers stayed at J.K.'s residence, they had no reason to believe that anyone inside the home was injured or in danger.

At oral argument, the State claimed the officers' continued presence on J.K.'s curtilage was reasonable because they believed the shopping cart in T.T.'s truck was stolen.[6] That argument is misguided. There is no general emergency exception to the warrant requirement, nor does the mere existence of a crime constitute an exception. Hardister, 849 N.E.2d at 571 (citing Mincey v. Arizona, 437 U.S. 385, 393-94 (1978) (holding the seriousness of a crime being investigated or the interests in making law enforcement more efficient do not justify dispensing with the warrant requirement or disregarding the Fourth Amendment)); see also Welsh v. Wisconsin, 466 U.S. 740, 753 (1984) (stating "no exigency is created simply because there is probable cause to believe that a serious crime has been committed"). We wish to make this point loud and clear: suspicion of criminal activity is not an exception to the warrant requirement.

---

[6] Alternatively, one might assume the police remained on J.K.'s curtilage based on suspicion arising from the sight of empty alcohol containers and their removal from view. However, such suspicion could not justify remaining on the curtilage because the information was obtained by way of an unconstitutional search.

14

Moreover, even if the shopping cart were relevant, we do not believe the officers had probable cause to believe the shopping cart was stolen. The officers' only reason for suspicion was the sight of a shopping cart labeled "Alco" in the bed of T.T.'s truck. But there is nothing inherently illegal about owning a shopping cart—as opposed to a patently illegal substance such as cocaine—nor was there anything about this particular shopping cart that signaled its possession was obviously illegal.[7] Without some additional evidence that the cart was stolen or that a local grocery store had recently reported a cart stolen, the officers' mere suspicion that a theft had occurred did not rise to the level of probable cause.

Here, the officers acted without any identifiable exception to the warrant requirement. We hold the officers' lengthy trespass and their conduct on J.K.'s property—including repeated knocking and yelling into the home—amounted to an unconstitutional search and violated J.K.'s Fourth Amendment right to be free from unreasonable searches and seizures. The evidence obtained against J.K. subsequent to this violation is fruit of the poisonous tree and subject to the exclusionary rule. Wong Sun, 371 U.S. at 484-85. Because all evidence of J.K.'s guilt was obtained consequent to the Fourth Amendment violations, J.K.'s delinquency adjudications must be reversed.

The dissent suggests the officers' prolonged and uninvited entry onto J.K.'s curtilage was reasonable because the officers were waiting for a tow truck. We cannot

---

[7] Although shopping carts are not commonly owned by members of the general public, they may be obtained legally with relative ease. See, e.g., Used Shopping Carts, EBAY.COM, http://www.ebay.com/bhp/used-shopping-carts (last visited Apr. 21, 2014). Acknowledging ownership of a shopping cart is not illegal and despite a lack of evidence the cart in this case was stolen, the dissent states it is "willing to take notice that a substantial number of carts not on store parking lots were likely filched by their owners." This is the sort of speculation that courts have long held cannot be the sole basis for probable cause.

15

agree. Setting aside the absence of probable cause, the decision to impound T.T.'s vehicle in this case was unreasonable under the Fourth Amendment and cannot justify the officers' trespass. In Fair v. State, 627 N.E.2d 427, 431-35 (Ind. 1993), our supreme court thoroughly discussed police authority to impound a vehicle and the means by which we determine the propriety of a decision to impound under the Fourth Amendment. Law enforcement's ability to impound a vehicle is justified as a "community caretaking function" used to facilitate public safety. Id. at 431-33. The court recognized "the risk . . . that a decision to tow will be motivated solely by the desire to conduct an investigatory search" and that this was "problematic given that the community caretaking function is 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" Id. at 433 (quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973)) (emphasis added). Accordingly, the approach for evaluating a police officer's decision to tow a vehicle must "accommodate the multiformity of hazards with which they must deal and succeed in ferreting out those impoundments which are a mere pretext for other, improper objectives." Id. With these principles in mind, the court held that to prove an impoundment was valid and warranted under the community caretaking exception, the State must demonstrate: "(1) that the belief that the vehicle posed some threat or harm to the community or was itself imperiled was consistent with objective standards of sound policing, and (2) that the decision to combat that threat by impoundment was in keeping with established departmental routine or regulation." Id. (citations omitted).

16

In this case, the State made no argument that the decision to tow was proper either before the trial court, in its appellate brief, or at oral argument. Regardless, the State could not possibly demonstrate that T.T.'s truck posed a threat to the community or that its removal was necessary to facilitate public safety. In Fair, the court noted the community caretaking function has been implicated in circumstances where "the arrest of the driver left his car unattended on a public highway; where the ownership of the vehicle cannot be established; and where the vehicle was on private property and the owner of the property requested removal." Id. (citations omitted). None of those circumstances were present in this case, and the record does not provide any other indication that public safety required the truck to be towed. In fact, T.T.'s truck was merely parked in front of J.K.'s home, where T.T. was staying as an overnight guest.[8]

Far from an attempt to ensure public safety, the tow in this case was called strictly for what the court in Fair deemed an improper objective—namely, the desire to conduct an investigatory search and acquire evidence relating to the violation of a criminal statute. Both the probable cause affidavit and testimony by Officer Gaillard make this fact abundantly clear. See Child's Exhibit A ("I advised Officer Hoffman that I believed the cart was stolen. I advised that I would impound the vehicle with the property inside and speak to the owner at a later date. . . . I asked dispatch the the [sic] next available tow due to the stolen property . . . . I then called Deputy Prosecutor Blair Todd and advised him . . . that I believed the cart was stolen and I requested a tow. Deputy Prosecutor Todd advised

---

[8] When asked where the truck was parked, Officer Gaillard testified that it was directly in front of J.K.'s house and stated "I wouldn't consider it on the road." Transcript at 34.

17

against towing the vehicle."); Tr. at 14 ("We decide that the cart in the truck is most likely stolen. . . . So I told [Officer Haley], I said, let's just tow the truck and we'll leave."). In Fair, we were called to "ferret[] out those impoundments which are a mere pretext for other, improper objectives." 627 N.E.2d at 433. But to call the decision to tow T.T.'s truck a "mere pretext" would imply that the officers' motives in this case are unclear or that public safety was a plausible explanation. This is not such a case. The officers' stated purpose in calling for the tow was to gather evidence of stolen property, and the record is utterly devoid of any indication that public safety was ever an issue. Even the local prosecutor directed the officers to cancel the tow. "An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action." Brigham City, 547 U.S. at 404 (citation and quotation marks omitted) (emphasis in original). The officers' decision to remain on the scene for the purpose of carrying out an illegal impoundment of T.T.'s vehicle is not an objectively reasonable justification under the Fourth Amendment.[9]

The dissent also implies that the officers' unconstitutional conduct did not result in the discovery of evidence. We cannot agree with this premise. Once Officer Hoffman knocked and received no answer, the officers were obliged to "leave and secure a warrant

---

[9] We also note that waiting for a tow truck would not require the officers to continue banging on the door and yelling into the house for nearly forty minutes. In fact, it would not require them to remain on J.K.'s property at all. This is true even if the officers' improper, subjective motivations in calling for the tow truck were relevant, which of course they are not. See Brigham City, 547 U.S. at 404. Furthermore, assuming *arguendo* there was probable cause to suspect a theft, a more reasonable approach would have been to simply lift the shopping cart from the open bed of the truck and then leave. No matter how you slice it, the officers' conduct in this case was unreasonable and unjustifiable.

18

if they want[ed] to pursue the matter." Hardister, 849 N.E.2d at 570. They did not leave. The officers' opportunity to observe and detain J.K. in his own front doorway was a direct result of the officers' decision to remain on the property in violation of the Fourth Amendment. Had the officers conformed to the Fourth Amendment's requirement to leave, we can conceive of no realistic situation in which J.K. could have been arrested.[10]

As a final point, we observe the trial court found there was conflicting evidence as to whether consent to search the home was given by J.K.'s mother, who was not present. Although not an argument made before us, we believe it is worth considering whether any potential consent in this case was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." See Brown v. Illinois, 422 U.S. 590, 597 (1975) (quoting Wong Sun, 371 U.S. at 486). We conclude it would not be. "[S]uppression is required of any items seized during the search of the house, unless the taint of the initial entry had been dissipated before the 'consents' to search were given. . . . This ordinarily involves showing that there was some significant intervening time, space, or event." United States v. Vasquez, 638 F.2d 507, 527-28 (2d. Cir. 1980). Any supposed consent given in this case was immediately following—or even during—the officers' unconstitutional search, and such consent would have been possible only because the officers chose to remain at J.K.'s

_____

[10] We also take issue with the dissent's suggestion that J.K.'s eventual face-to-face with the officers was somehow a voluntary encounter and a lawful arrest and that this event was unconnected with the officers' act of knocking and yelling into the house for nearly an hour. Considering the officers' conduct on the curtilage and the officers' command for T.T. to retrieve the owner of the residence, we would conclude J.K. was unconstitutionally seized. See United States v. Jerez, 108 F.3d 684, 689-93 (7th Cir. 1997) (holding defendant was impermissibly seized upon opening the door of his hotel room after officers knocked for three minutes). However, an in-depth discussion of whether a seizure occurred here is unnecessary, because our determination of an illegal search under Jardines is more than sufficient to warrant reversal of J.K.'s juvenile adjudications.

19

front doorstep for an unduly lengthy amount of time, in violation of his Fourth Amendment rights. Thus, there is no need to remand for a determination of the facts regarding consent, because any consent given by J.K.'s mother would be tainted by the unconstitutional invasion of J.K.'s curtilage.[11]

IV. Residential Entry and Exigent Circumstances

Even assuming, *arguendo*, that the officers' continued presence at J.K.'s home was reasonable, the officers' warrantless entry into the home was unreasonable under the Fourth Amendment. The State asserts two justifications for the entry: (1) the officers entered the home to ensure the safety of unsupervised juveniles who may have been drinking inside the residence and (2) to prevent the imminent destruction of evidence.

As to the State's first rationale, the Supreme Court has recognized that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Brigham City, 547 U.S. at 403. The State's assertion that the facts of this case fit within this exception is unconvincing.

Prior to the officers' entry, they were aware of the following facts: (1) T.T. had an odor of alcohol on his breath; (2) J.K. had bloodshot eyes; (3) both J.K. and T.T. were underage; (4) J.K.'s mother was not present, but the officers did not have any knowledge

---

[11] It is also possible, given the circumstances of this case, that any alleged consent given by J.K.'s mother would not comply with Indiana Code section 31-32-5-1, which sets out requirements for a valid waiver of a child's constitutional rights.

as to whether another supervising adult was present; and (5) the officers believed there were more people inside the residence.

First, the officers' belief that other persons in the residence had consumed alcohol was pure speculation. The only persons the officers knew were drinking were J.K. and T.T., neither of whom required emergency assistance. And neither J.K. nor T.T. gave any indication that someone inside was injured or may be in need of emergency assistance. In reality, there was no objective evidence that the underage drinking that occurred in this case created an imminent threat of injury or death to someone inside the residence.[12]

Second, the State fails to offer any argument—convincing or otherwise—that underage drinking is a circumstance that <u>as a general matter</u> creates a threat of imminent injury. The mere occurrence of underage drinking does not give law enforcement *carte blanche* to enter the privacy of one's home without a warrant. Unlike other situations where we have found certain conduct involves inherent danger creating an exigency (e.g. manufacturing methamphetamine in a populated area), there is nothing so inherently dangerous about underage drinking that renders the imbiber subject to the threat of imminent injury. Cf. <u>State v. Crabb</u>, 835 N.E.2d 1068 (Ind. Ct. App. 2005) (finding exigent circumstances exist where officers have probable cause to suspect methamphetamine manufacturing and there is evidence that someone inside the home is subject to the threat

---

[12] When pressed at oral argument to recount any specific evidence the police were aware of that established an exigency justifying warrantless entry into the residence, the State responded that T.T. had been drinking and the juveniles were "being irresponsible." There is no irresponsibility exception to the warrant requirement.

21

of danger, because of the inherent risk of explosion), <u>trans. denied</u>; <u>also</u> <u>Holder v. State</u>, 847 N.E.2d 930, 937 (Ind. 2006) (same).

"Courts should not be reticent in enforcing the constitutional rule restricting the search of a person's home without a warrant or consent, and therefore, demand a genuine showing of an emergency before they will excuse the police's failure to obtain a warrant." <u>Hawkins v. State</u>, 626 N.E.2d 436, 439 (Ind. 1993). "[T]he burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 750 (1984). The State has failed to meet its burden.[13]

The dissent states it believes the officers' warrantless entry into J.K.'s home was reasonable. Without citation to authority, it offers two reasons in support of this position: (1) it was likely that other people were inside the house; and (2) news stories about the potential consequences of teenage drinking parties. These do not meet an exception to the warrant requirement—separately or together. First, the possible presence of someone else in the home means nothing, and nothing in the record suggests the officers had evidence those persons were in danger or even that they were drinking or underage. Second, reliance on the potential consequences of teenage drinking—without

---

[13] The trial court concluded the entry was "reasonable . . . based on the concern for the safety and security of [the] juveniles." Appellant's App. at 18 (citing <u>Rush v. State</u>, 881 N.E.2d 46 (Ind. Ct. App. 2008)). <u>Rush</u> involved an underage drinking party; however, the facts were much different. In <u>Rush</u>, the officers responded to a report of an underage drinking party. When they arrived, they observed several teenagers attempting to flee, and the officers entered the curtilage to detain those escaping juveniles. The officers in <u>Rush</u> also entered the residence; however, the residential entry was made <u>with consent</u>. 881 N.E.2d at 52. The generic references to safety made by the court in <u>Rush</u> were irrelevant to the holding and are merely dicta. That said, to the extent <u>Rush</u> can be read to imply that underage drinking is an exigent circumstance in and of itself, we respectfully disagree.

any evidence they were actually present here—is equally unavailing, because the exigent circumstances inquiry is fact-specific and those circumstances must be present in this particular case to justify warrantless entry. Missouri v. McNeely, 133 S.Ct. 1552, 1559 (2013) ("To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, this Court looks to the totality of circumstances . . . [T]he fact-specific nature of the reasonableness inquiry demands that we evaluate each case of alleged exigency based on its own facts and circumstances.") (citations and quotation marks omitted). Simply stated, the likelihood of occupants in a home and a vague anecdotal reference to a potential worst-case-scenario effect of underage drinking does not amount to objective evidence producing a need to enter the home to prevent imminent injury or death in this case.[14]

Alternatively, the State argues the officers' entry was permissible to prevent the destruction of evidence. An exigency justifying warrantless entry exists when there is a need to "prevent the imminent destruction of evidence." Brigham City, 547 U.S. at 403.

---

[14] The dissent also implies J.K.'s adjudications could be affirmed without evidence obtained from the residential entry, stating the entry was reasonable "but it need not be so in order for us to resolve this appeal." In other words, the dissent believes J.K.'s adjudications could be affirmed solely based on J.K.'s detention on the front porch and the observation of J.K.'s bloodshot eyes. Where constitutional error occurs, a conviction may not be affirmed unless the State can show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 23-24 (1967). That burden would not be met here. Prior to the residential entry, no admissible evidence existed proving J.K. was in possession of alcohol, and J.K.'s bloodshot eyes could not sustain his adjudication for illegal possession. See Lawson v. State, 803 N.E.2d 237, 242-43 (Ind. Ct. App. 2004) (holding where only evidence was odor of alcohol and an empty container, convictions for both illegal consumption and illegal possession violated Indiana's Double Jeopardy Clause), trans. denied. Further, all evidence that J.K. aided illegal consumption (i.e. alcohol containers and juveniles in the home under the influence) was obtained by way of the officers' warrantless residential entry.

23

However, this argument is based on Officer Haley's observation of empty alcohol containers that were later removed from view by someone inside the residence. That observation was made during Officer Haley's unconstitutional invasion of J.K.'s curtilage, and thus, that fact cannot justify the officers' warrantless entry. Wong Sun, 371 U.S. at 484-85.

Any concern for dissipation of alcohol in the juveniles' blood would also fail to support a claim of exigent circumstances in this case. Whether such an exigency exists is based on the totality of the circumstances, and the natural dissipation of alcohol in the bloodstream is not a *per se* exigency. McNeely, 133 S.Ct. at 1556 (holding the dissipation of alcohol is not a *per se* exigency allowing a warrantless blood draw in drunk driving investigations). Here, the officers did not even know whether there were additional juveniles in the house who had been drinking. Further, the need to obtain quick results for an adult suspected of driving under the influence does not necessarily translate to a case involving juveniles, where the presence of any alcohol in the bloodstream is illegal; thus, law enforcement officers have additional time to secure incriminating evidence against an underage drinker. See id. at 1559 (stating exigent circumstances exist only when there is "no time to secure a warrant"). And lastly, all three of J.K.'s offenses in this case were Class C misdemeanors. The relatively minor nature of the offenses weighs against finding an exigency based on any potential destruction of evidence. See Welsh, 466 U.S. at 753 (holding "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made").

24

Finally, we note that the act of detaining or arresting J.K. and T.T. outside the home would not provide a legal basis for a subsequent warrantless entry into the home. Put simply, under these circumstances, doctrines such as "search incident to arrest" and "protective sweep" would not justify warrantless entry into J.K.'s home. See Chimel v. California, 395 U.S. 752 (1969) (holding warrantless search of defendant's home was not justified as a search incident to arrest); cf. also Maryland v. Buie, 494 U.S. 325 (1990) (discussing protective sweep doctrine). This is true even if we were to assume the search that occurred on J.K.'s property and resulting arrest were legal—a point against which we are in steadfast opposition.

## Conclusion

We conclude the officers' warrantless entry on J.K.'s curtilage, including both the sides of the house and back yard, violated the Fourth Amendment. Further, we hold the officers' presence at the home and continually knocking for approximately one hour without an answer from an occupant exceeded their implied invitation to knock and talk and constituted an unreasonable search in contravention of the Fourth Amendment. Finally, we would also conclude the officers' warrantless residential entry was unconstitutional. All evidence against J.K. was obtained consequent to these constitutional violations. Accordingly, his adjudications must be reversed.

We reverse.

CRONE, J., concurs.

SHEPARD, S.J., dissents with separate opinion.

25

# IN THE
# COURT OF APPEALS OF INDIANA

| | | | |
|---|---|---|---|
| J.K., | ) | | |
| | ) | | |
| Appellant-Defendant, | ) | | |
| | ) | | |
| vs. | ) | No. | 66A03-1306-JS-220 |
| | ) | | |
| STATE OF INDIANA, | ) | | |
| | ) | | |
| Appellee-Plaintiff. | ) | | |
| | ) | | |

**SHEPARD, Senior Judge**, dissenting.

J.K.'s lawyer places two assertions before us. He says one officer unconstitutionally entered his backyard, and he claims the officers stayed too long at his property and knocked on his door too many times.

My reaction to these two points is that the officer's stay in the backyard produced no evidence supporting the juvenile finding that is being appealed, and that the continued knocking is not what led the juveniles inside ultimately to step outside, visibly impaired from drinking.

My take on the events that gave rise to this proceeding, viewed favorably to the trial court's judgment as the standard for appellate review demands, is rather different than the way the majority sees the facts.

The Winamac Police Department dispatched officers just after 1 a.m. to investigate a complaint that juveniles were pushing a shopping cart around the neighborhood, making enough noise to provoke dogs to bark at an hour when most people are trying to sleep.

The officers quickly observed a gathering of vehicles near 412 Decker Drive, including a

26

pickup truck visibly containing the offending shopping cart. This cart was labeled with the name of a store about a mile away. Transcript at 12-15. While the majority relies on the idea that there is nothing inherently illegal with owning a shopping cart, I'd be willing to take notice that a substantial number of carts not on store parking lots were likely filched from their owners.

As the majority observes, the officer who initially knocked on the front door could hear multiple people inside and see them peering through the blinds. The officer who went around to the back yard could see beer cans and wine bottles on the kitchen counter.

When no one answered the front door, the officers decided to tow the truck containing the apparently stolen shopping cart. Most of the time the police remained on the scene consisted of waiting for the tow truck to arrive, something like forty minutes.

The Court's decision to reverse the delinquency finding rests substantially on (1) the long period that one officer occupied the back yard, (2) the many times the officer in front knocked on the door, and (3) the length of the period officers remained on the scene waiting for the tow.

I agree that there was little justification for a long occupation of the back yard. On the other hand, very little of consequence occurred as a result. Even after seeing the beer and wine through the kitchen window, the police did not take any particular action other than to remain in place, and there is abundant evidence of J.K.'s offenses even if what had been seen in the kitchen were held inadmissible.

The same can be said for the repeated knocks at the front door. None of these produced a response from the occupants, and the police stayed outside.

What happened next was that the tow truck arrived and the owner of the pickup, seventeen-year-old T.T., decided to come out and look after his interests. He opened the front door and stepped outside, visibly intoxicated. Transcript 19-20. The officers asked T.T. to summon the owner of the residence, and seventeen-year-old J.K. appeared, his eyes bloodshot.

27

Transcript 22.

The trial judge concluded that the officers, having seen T.T. and J.K. in this state, were warranted in entering the home to assure the safety of the other occupants. It seemed highly likely there were other occupants in light of the large number of cars parked out front, and we read almost daily about the sad consequences of teenage drinking parties.

I am inclined to think Judge Shurn was right about the reasonableness of the officers entering the home, but it need not be so in order for us to resolve this appeal.

I conclude that the police were reasonable to wait for the tow truck, and reasonable to effect arrests once T.T. and J.K. appeared at the door of the home, noticeably under the influence.