## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 06 2015, 9:51 am

*[signature]*

**CLERK**

of the supreme court, court of appeals and tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Steven Knecht | Gregory F. Zoeller |
| Vonderheide & Knecht, P.C. | Attorney General of Indiana |
| Lafayette, Indiana | |
| | Katherine Modesitt Cooper |
| | Deputy Attorney General |
| | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Derek Core, | March 6, 2015 |
| *Appellant-Defendant,* | Court of Appeals Case No. 91A05-1406-CR-265 |
| v. | Appeal from the White Superior Court |
| State of Indiana, | The Honorable Robert B. Mrzlack, Judge |
| *Appellee-Plaintiff* | Cause No. 91D01-1310-FC-180 |

**Najam, Judge.**

## Statement of the Case

Derek Core appeals his conviction, following a jury trial, for robbery, as a Class C felony. He presents two issues for our review, which we revise and restate as follows:

> 1. Whether the trial court abused its discretion when it admitted certain evidence, which Core characterizes as the fruit of an unconstitutional traffic stop.

> 2. Whether his sentence, which was enhanced after Core pleaded guilty to being an habitual offender, is inappropriate in light of the nature of the offense and his character.

We affirm.

## Facts and Procedural History

On October 3, 2013, Core, Omika Thurman, and Jason Roar traveled from Indianapolis to White County, Indiana, to rob a bank. Core had previously selected White County because Core believed that it would have fewer officers than Indianapolis, which would translate into a longer police-response time to the robbery. White County also has access to Interstate 65, which Core believed would make it easier to flee from the crime. After Thurman had scoped out two banks, Core selected Farmers State Bank ("the Bank") in Brookston as the three's target because it had only two tellers, both of whom were female. After Core had selected the Bank but before the three effected the robbery, to help conceal Core's identity Thurman bought Core an Indianapolis

Colts baseball cap. The two then attempted, with limited success, to remove the stitching on the cap "so it wouldn't be identifiable." Tr. at 276.

[3] Shortly before 1:00 p.m., Core and Roar entered through the Bank's front doors, while Thurman, the getaway driver, waited outside in a Chevrolet Suburban. Once inside, Core—wearing sunglasses, embroidered jeans, gloves, the Colts baseball cap, and dark tennis shoes with white soles—jumped onto the counter and screamed at the tellers to "get back." *Id.* at 209. Core and Roar then took money from the tellers' drawers, including certain sums of "bait" money.[1] Tr. at 14. The two did not have bags and stuffed the money into their pockets. Core also took a bag that belonged to a teller, which, among other things, contained her driver's license and credit cards. Core and Roar then left the Bank and fled in the Suburban. Core directed Thurman to southbound State Road 43, which leads to Interstate 65.

[4] Indiana State Trooper Darrick Scott received a call at his post, located on State Road 43 near Interstate 65, of a robbery in progress at the Bank. The call did not include any information about the getaway vehicle, but a later transmission stated that the two assailants were black males. Trooper Scott activated the lights and siren of his police vehicle and drove northbound on State Road 43. On his way to the Bank, Trooper Scott observed a number of vehicles pull off to the side of the road and yield the right of way to him. Most drivers of the

---

[1] Bait money means uncirculated currency with prerecorded serial numbers.

yielding vehicles, he noticed, looked around inquiringly, but one driver, a female in a southbound Suburban later identified as Thurman, attempted to hide her face behind the vehicle's steering wheel and her left arm. Trooper Scott then checked his rearview mirror and noticed that the Suburban did not have a license plate attached to its rear bumper. Trooper Scott could see a silhouette in the Suburban's darkly tinted rear window but could not discern whether the vehicle had a license plate. At that time, Trooper Scott did not see anyone but Thurman in the Suburban.

[5]     Aware that a number of other officers were also in route to the Bank, Trooper Scott decided to make a U-Turn and "inquire more about the vehicle southbound that [he had] observed." Tr. at 15. As he pulled behind the Suburban, with lights and siren still activated, the vehicle reentered the roadway and began to flee southbound on State Road 43. As Trooper Scott pursued the vehicle, he eventually managed to get near enough to the rear of the vehicle to detect the numbers of a temporary license plate in the rear window.

[6]     During the pursuit, Trooper Scott observed the Suburban speed, cross the center line, and fail to yield to him. Further, he saw the silhouettes of two men in the backseat of the Suburban, "popping up and down, just peeking and looking and observing to see what was going on." Tr. at 19. After several miles of pursuit, in which several other officers joined, officers disabled the Suburban. When the vehicle came to a stop, Core and Roar fled on foot, but officers apprehended both. Thurman remained in the Suburban.

[7]     When apprehended, Core was wearing gloves, and officers recovered $7,267.00 on his person, which included the Bank's bait money. In a later inventory search of the Suburban, among other items, officers recovered a Colts baseball cap with the emblem partially removed, sunglasses, money ties with the Bank's emblem, a black leather bag, and several cards that evinced the name of the Bank's teller, whose bag was taken by Core during the robbery.

[8]     On October 3, 2013, the State charged Core with two counts of robbery, one count as a Class C felony and one count as a Class B felony. And, on November 4, 2013, the State filed a third count that sought to have Core adjudicated an habitual offender.[2]

[9]     After the State had charged him, on January 14, 2014, Core moved to suppress:

> all the property seized by arresting officers, all observations made by the arresting officers, all statements made by [Core], and all evidence taken from [Core] after he was detained and arrested into the White County Jail.

Appellant's App. at 29. As the basis for his motion, Core stated that:

> the initial stop of the [Suburban, of which Core was a passenger,] by arresting officers violated [Core's] rights under the Fourth Amendment of the Constitution of the United States and Article I, Section 11 of the Indiana Constitution because officers had no

---

[2] The State amended Count II twice and Count III once. As amended, Count II alleged that three officers had suffered injuries as a result of the robbery.

reasonable suspicion or probable cause to make the initial stop of the vehicle.

*Id.*

[10] Core acknowledged in his memorandum in support of his motion to suppress that Trooper Scott had

> testified that he thought the driver was trying to hide from him . . . [and] that he also noticed that the [Suburban] did not have a license plate on the rear bumper. He testified that[,] for this reason, he turned around and decided to stop the vehicle.[3]

*Id.* at 34. Nevertheless, Core "conten[ded] that the Officer stopped the [Suburban] based on the fact that there was a black female driving the vehicle and lacked any probable cause that the vehicle committed any crime nor [sic] having any reasonable suspicion that criminal activity was afoot." *Id.* at 35.

[11] The trial court, however, found that "Trooper Scott and other police officers had reasonable suspicion to pursue the driver of the SUV[] for several reasons," including, among others, "to investigate whether the occupants of the SUV were involved in the bank robbery . . . ; [and] to investigate the infraction of improper display of a license plate." *Id.* at 40. Thus, the court denied Core's

---

[3] Similarly, at trial, Trooper Scott testified that "[he] notice[d] [the Suburban] did not have a license plate on [the] vehicle, the rear part of the vehicle. So, that was going to be my reason to stop the vehicle." Tr. at 293.

motion, and the case proceeded to jury trial, which was held from April 29 through May 1.[4]

[12] At trial, Core renewed his objections to the admissibility of the evidence obtained after the initial stop of the Suburban. The court noted Core's objection as a continuing one that "renew[ed] [the] grounds set forth in the Motion to Suppress," but it "overrule[d] the objection and again denie[d] the Motion to Suppress." Tr. at 293. The court further informed Core that he had preserved the issue for appellate review.[5]

[13] At the conclusion of the trial, the jury convicted Core of robbery, as a Class C felony, but acquitted him of robbery, as a Class B felony, and Core admitted that he was an habitual offender. On May 28, the court held a sentencing hearing. At the conclusion of the sentencing hearing, the court found in aggravation that (1) Core had seven prior convictions as an adult, five of which were felonies, including convictions for auto theft, robbery, and confinement; (2) Core committed the October 1 robbery while on parole for his prior robbery and confinement convictions;[6] (3) previous attempts at rehabilitation, both as a juvenile and as an adult, had failed; and (4) Core's conduct in the White County Jail while awaiting trial had resulted in a loss of privileges and a

---

[4] On the first day of Core's trial, he elected to proceed pro se but have standby counsel present. On the second day of his trial, Core elected to have standby counsel conduct the remainder of the proceedings.

[5] Thus, we disagree with the State that Core has waived this issue for appeal.

[6] Core was released on parole from the Indiana Department of Correction on August 21, 2013.

pending battery charge. The court found in mitigation that (1) Core had expressed remorse; (2) Core had obtained a GED despite having a learning disability; and (3) Core had issues with his health. The court found that the aggravators outweighed the mitigators, and it sentenced Core to eight years executed in the Department of Correction, which it enhanced by an additional twelve years for a total aggregate term of twenty years executed. This appeal ensued.

## Discussion and Decision

### *Issue One: Admission of Evidence*

[14] Core first contends that the trial court abused its discretion when it admitted certain evidence against him. As he did in his motion to suppress and at trial, core asserts that Trooper Scott lacked reasonable suspicion to conduct the initial stop of the Suburban, which violated Core's rights to be free of an unreasonable seizure. Everything else—pursuit included—Core argues, would not have occurred but for the initial, unconstitutional stop of the Suburban. We cannot agree.

[15] "The general admission of evidence at trial is a matter we leave to the discretion of the trial court." *Clark v. State*, 994 N.E.2d 252, 259-60 (Ind. 2013). As we explained in *J.K. v. State*, 8 N.E.3d 222, 228 (Ind. Ct. App. 2014), "[a] trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. A trial court abuses its discretion when its decision is clearly against

the logic and effect of the facts and circumstances or when the trial court has misinterpreted the law."

[16] Further, as our supreme court has stated:

> Because a traffic stop is a seizure under the Fourth Amendment, police may not initiate a stop for any conceivable reason, but must possess at least reasonable suspicion that a traffic law has been violated or that other criminal activity is taking place. An officer's decision to stop a vehicle is valid so long as his on-the-spot evaluation reasonably suggests that lawbreaking occurred.

*Meredith v. State*, 906 N.E.2d 867, 869-70 (Ind. 2009) (citations omitted).

[17] Here, Core argues that the trial court abused its discretion when it held that reasonable suspicion supported the initial stop of the Suburban. But our supreme court has previously held that Indiana law requires license plates, interim or permanent, "be displayed upon the rear of the vehicle, securely fastened, in a horizontal position." *Id.* at 870 (quotation marks omitted). "[P]lacing a license plate on the *inside* of the back window clearly does not satisfy the requirement that license plates be displayed *upon* the rear of the vehicle." *Id.* at 872 (emphasis in original) (quotation marks omitted). And, if one's plate is "not displayed appropriately," an officer may properly stop that person. *Id.* at 871, 873. This is so even if the "officer would [not] have otherwise made the stop but for ulterior suspicions or motives." *Turner v. State*, 862 N.E.2d 695, 699-700 (Ind. Ct. App. 2007).

[18] At the suppression hearing, Trooper Scott testified that he pulled in behind the Suburban "[t]o inquire more about the plate." Tr. at 35. And, at trial, Trooper Scott testified that he planned to stop the Suburban because "[he] notice[d the vehicle] did not have a license plate." Tr. at 293. Thus, we hold that "the initial stop [of the Suburban] due to the suspected license plate display violation was proper and the trial court did not err in refusing to suppress the resulting evidence on this basis."[7] *Meredith*, 906 N.E.2d at 873.

### Issue Two: Sentencing

[19] Core also argues that his sentence is inappropriate in light of the nature of the offense and his character. Article 7, Sections 4 and 6 of the Indiana Constitution "authorize[] independent appellate review and revision of a sentence imposed by the trial court." *Roush v. State*, 875 N.E.2d 801, 812 (Ind. Ct. App. 2007) (alteration in original). This appellate authority is implemented through Indiana Appellate Rule 7(B). *Id.* Revision of a sentence under Rule 7(B) requires the appellant to demonstrate that his sentence is inappropriate in light of the nature of his offenses and his character. Ind. Appellate Rule 7(B); *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). We assess the trial court's recognition or non-recognition of aggravators and mitigators as an

---

[7] For the same reasons Core cannot demonstrate error under the federal constitution he cannot demonstrate error under the Indiana Constitution. *See, e.g.*, *Sowers v. State*, 724 N.E.2d 588, 591-92 (Ind. 2000); *see also Turner*, 862 N.E.2d at 699-700 (holding that, under the Indiana Constitution, "[p]olice officers may stop a vehicle when they observe minor traffic violations. . . . If there is an objectively justifiable reason [for the stop], then the stop is valid whether or not the police officer would have otherwise made the stop but for ulterior suspicions or motives.").

initial guide to determining whether the sentence imposed was inappropriate. *Gibson v. State*, 856 N.E.2d 142, 147 (Ind. Ct. App. 2006). However, "a defendant must persuade the appellate court that his or her sentence has met th[e] inappropriateness standard of review." *Roush*, 875 N.E.2d at 812 (alteration original).

[20] Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222, 1224 (Ind. 2008). The principal role of appellate review is to attempt to "leaven the outliers." *Id.* at 1225. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." *Id.* at 1224.

[21] Here, Core contends that we should revise his sentence because his "actions were no worse than those involved in any other case of this kind." Appellant's Br. at 30. In support, he points out that he was unarmed and that he did not physically harm anyone at the Bank. But we are not persuaded. Core, with the help of two others, planned a bank robbery and executed it in the middle of the day, during the Bank's operating hours. He and his confederates then fled along a well-traveled road in their vehicle. The fact that these actions did not result in another's physical injury does not detract from the seriousness of Core's crime. Indeed, as the trial court stated at Core's sentencing hearing, Core inflicted "devastating" fear on the Bank's employees that "they will carry

with them [for] the rest of their lives." Tr. at 567-68. Core's sentence is not inappropriate in light of the nature of the offense.

[22] Core also asserts that his sentence is inappropriate because he has a "redeemable character." Appellant's Br. at 30. Core's criminal history, however, does not support that assertion. Core has a juvenile history and seven adult convictions, including five felony offenses. He has been adjudicated an habitual offender. Moreover, Core was on parole for a prior robbery that he had committed when he committed the current robbery. And, while in jail for his current crime, Core's conduct resulted both in a loss of privileges and in the filing of more charges against him. As the trial court noted, Core has had a number of opportunities to rehabilitate himself, both as a juvenile and as an adult, but he has not done so. Thus, we cannot say that Core's sentence is inappropriate in light of his character.

[23] Affirmed.

[24] Mathias, J., and Bradford, J., concur.