

**FILED**

Nov 07 2016, 9:23 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ruth Johnson
Marion County Public Defender

Darren Bedwell
Marion County Public Defender
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Monika Prekopa Talbot
Christina Pace
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jordan Jacobs,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 7, 2016

Court of Appeals Case No.
49A02-1601-CR-19

Appeal from the Marion Superior Court

The Honorable Linda Brown, Judge

Trial Court Cause No.
49G10-1509-CM-31258

**Bradford, Judge.**

# Case Summary

On September 2, 2015, eighteen-year-old Appellant-Defendant Jordan Jacobs was arrested after he was found to be in possession of a handgun without having a license for said handgun. Appellee-Plaintiff the State of Indiana ("the State") subsequently charged Jacobs with Class A misdemeanor carrying a handgun without a license. Following a bench trial, Jacobs was found guilty as charged. Jacobs challenges his conviction on appeal, arguing that the trial court abused its discretion in admitting the handgun into evidence at trial. We affirm.

# Facts and Procedural History[1]

In late-August or early-September of 2015, Indianapolis Metropolitan Police Officer Terry Smith, a detective assigned to investigate potential gang activity, received a complaint from the district commander that there had been multiple runs to the Blackburn Terrace Apartments on East 30th Street because of shots fired by juveniles who wore red clothing and were possible gang members. The Blackburn Terrace Apartments are located in an area which is known to be a high-crime neighborhood. After receiving the complaint from the district commander, Officer Smith went to the Blackburn Terrace Apartments during

---

[1] We held oral argument in this case on October 6, 2016, at Peru High School in Miami County. We thank the members of the Miami County Bar Association and the students, faculty, and staff of Peru High School for their gracious hospitality. We also commend counsel for the high quality of their arguments.

school hours at approximately 2:00 p.m. on September 2, 2015. Officer Smith observed a group of individuals, many of whom appeared to be juveniles of school age, gathered in a park located just south of the apartment complex. Officer Smith also observed that some of the individuals were wearing red, which Officer Smith knew to be a gang color. Jacobs was present with the group and at one point had a red t-shirt slung across his shoulder.

[3] Officer Smith watched the group, which was gathered around a picnic table, for several hours. He noticed a number of individuals come and go, including several adult males. At some point, Officer Smith's attention was drawn to Jacobs, whom Officer Smith believed to be a juvenile. Officer Smith observed that when a park ranger in a marked vehicle approached the vicinity where the group was located, Jacobs and another individual, who also appeared to be a juvenile, left the group and began walking west toward the apartment complex. Officer Smith observed that Jacobs and the other individual ended up on 30th Street. Jacobs and the other individual returned to the group after the park ranger left the area. In light of his observations, including the "coming and going" of a number of individuals, many of whom were wearing a known gang color and that many of the juveniles appeared to be of school age but were not in school, Officer Smith contacted the north district and requested that marked units be sent to assist in "stopping" the group. Tr. p. 8.

[4] As the marked police vehicles began approaching from the east, Jacobs and the other individual again began to quickly walk away from the group, again heading west. As the police came closer, Jacobs and the other individual

picked up their pace. Officer Smith, who was wearing a vest reading "police" on the front, instructed Jacobs and the other individual to stop. Tr. p. 9. The other individual complied with Officer Smith's instruction and stopped, but Jacobs continued walking.

[5] After Jacobs failed to comply with Officer Smith's instruction to stop, Officer Smith and Indianapolis Metropolitan Police Officer Jeremiah Casavan ordered Jacobs to the ground. Jacobs complied with this order. Jacobs was placed in handcuffs but told that he was not under arrest. Officers Smith and Casavan escorted Jacobs and the other individual to the park shelter where the other members of the group were gathered.

[6] As Officer Casavan was escorting Jacobs to the park shelters, he looked at Jacobs's clothing and observed the outline of a handgun in Jacobs's front right pocket. Officer Casavan asked Jacobs whether he had any weapons on him. Jacobs responded that he did not. Officer Casavan then reached inside Jacobs's pocket and removed the handgun. Jacobs was thereafter placed under arrest.

[7] On September 13, 2015, the State charged Jacobs with Class A misdemeanor carrying a handgun without a license. The trial court conducted a bench trial on November 10, 2015. During trial, the State sought to admit the handgun into evidence. Jacobs objected to admission of the handgun, arguing that it was recovered in violation of both the Fourth Amendment to the United States Constitution ("Fourth Amendment") and Article I, Section 11 of the Indiana Constitution ("Article I, Section 11"). The trial court admitted the handgun

into evidence over Jacobs's objection. The State also presented evidence at trial that Jacobs did not have a license to carry the handgun. The trial court took the matter under advisement, after which it found Jacobs guilty as charged. The trial court subsequently sentenced Jacobs to a term of 365 days with 357 of those days suspended to probation.

# Discussion and Decision

[8] Jacobs contends that the trial court abused its discretion in admitting the handgun into evidence at trial because the handgun was recovered in violation of Jacob's rights under the Fourth Amendment and Article I, Section 11.

# I. Standard of Review

[9] The trial court has broad discretion to rule on the admissibility of evidence. [*Clark v. State*, 994 N.E.2d 252, 259-60 (Ind. 2013)]. We review its rulings "for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." [*Id*. at 260]. But when an appellant's challenge to such a ruling is predicated on an argument that impugns the constitutionality of the search or seizure of the evidence, it raises a question of law, and we consider that question de novo. *Kelly v. State*, 997 N.E.2d 1045, 1050 (Ind. 2013).

*Guilmette v. State*, 14 N.E.3d 38, 40-41 (Ind. 2014). Further, when reviewing a trial court's ruling on the admissibility of evidence obtained from an allegedly illegal search, we do not reweigh the evidence but defer to the trial court's factual determinations unless clearly erroneous. *Hansbrough v. State*, 49 N.E.3d

1112, 1114-15 (Ind. Ct. App. 2016) (citing *Meredith v. State*, 906 N.E.2d 867, 869 (Ind. 2009)), *trans. denied*. "We view conflicting evidence most favorable to the ruling, and we consider 'afresh any legal question of the constitutionality of a search and seizure.'" *Id*. (quoting *Meredith*, 906 N.E.2d at 869).

## II. The Fourth Amendment

[10] Jacobs argues that the warrantless search of his person was conducted in violation of his Fourth Amendment rights.

## A. Legal Authority

[11] The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness[.]'" *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). We approach cases involving warrantless searches with the basic understanding that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (footnote omitted)). Where there is no clear practice concerning the constitutionality of a search, the reasonableness of the search is judged by balancing "the degree to which it intrudes upon an individual's privacy and ... the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton*, 526 U.S. 295, 299-300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999).

*Wertz v. State*, 41 N.E.3d 276, 279 (Ind. Ct. App. 2015) (emphasis to words "*per se*" in original), *trans. denied*. Application of the Fourth Amendment has been extended to the States through the Due Process Clause of the Fourteenth Amendment. *Hansbrough*, 49 N.E.3d at 1114-15.

[12]     An officer may briefly detain someone to investigate, without a warrant or probable cause, if specific and articulable facts and the rational inferences therefrom give the officer "reasonable suspicion that criminal activity 'may be afoot.'" *Moultry v. State*, 808 N.E.2d 168, 171 (Ind. Ct. App. 2004). To determine whether there was reasonable suspicion, we must determine whether the totality of the circumstances show "the detaining officer had a particularized and objective basis for suspecting legal wrongdoing." [*Johnson v. State*, 992 N.E.2d 955, 958 (Ind. Ct. App. 2013), *trans. denied*]. During such an investigatory stop, a police officer may conduct a

> reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

> *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968).

*D.F. v. State*, 34 N.E.3d 686, 689 (Ind. Ct. App. 2015), *trans. denied*. "Although reasonable suspicion requires more than inchoate and unparticularized hunches, it is a less demanding standard than probable cause and requires a

showing of 'considerably less' proof than that required to establish wrongdoing by a preponderance of the evidence." *Bridgewater v. State*, 793 N.E.2d 1097, 1100 (Ind. Ct. App. 2003) (quoting *Cardwell v. State*, 666 N.E.2d 420, 422 (Ind. Ct. App. 1996), *trans. denied*).

## B. Analysis

[13] In arguing that the handgun was recovered in violation of his Fourth Amendment rights, Jacobs asserts that Officers Smith and Casavan lacked reasonable suspicion that he was engaged in criminal activity. For its part, the State asserts that the handgun was not recovered in violation of Jacobs's Fourth Amendment rights because at the time Jacobs was detained, Officers Smith and Casavan had reasonable suspicion to believe that Jacobs was committing the status offense of truancy.[2]

[14] A determination of whether the totality of the circumstances indicate that the law enforcement officer had reasonable suspicion to believe that criminal activity was afoot includes a determination of whether the defendant's own actions were suspicious. *Stalling v. State*, 713 N.E.2d 922, 924 (Ind. Ct. App. 1999). Further, while presence in a high-crime neighborhood alone may not constitute reasonable suspicion, presence in a high-crime area can be considered

---

[2] Status offenses, including truancy, are offenses that would not be a crime if committed by an adult, but for which a juvenile may still be adjudicated to be a delinquent child. *See R.B. v. State*, 839 N.E.2d 1282, 1284 (Ind. Ct. App. 2005) (providing that status offenses include leaving home without permission; truancy; habitually disobeying the reasonable and lawful commands of the child's parent, guardian, or custodian; violating curfew; and violating laws concerning minors and alcoholic beverages).

as a factor in the totality of the circumstances confronting an officer at the time of a stop. *Bridgewater*, 793 N.E.2d at 1100. Similarly, avoiding the police or turning away from them is not enough by itself to constitute reasonable suspicion.

> However, we note the [United States] Supreme Court's comment that "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion. Headlong flight—wherever it occurs—is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000) (citations omitted). The Supreme Court noted that allowing police and the courts to consider flight as a factor in determining whether reasonable suspicion existed does not conflict with the principle that an individual has the right to ignore police and go about his business if the officer approaches an individual without probable cause. The Court explained:

>> [A]ny "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.

> *Id.* at 125, 120 S.Ct. at 676 (citations omitted).

> Judicial interpretation of what constitutes "reasonable suspicion"

is fact-sensitive. *Wilson v. State*, 670 N.E.2d 27, 30-31 (Ind. Ct. App. 1996).

*Id.*

### 1. Stalling *and* Bridgewater

In support of his claim that the handgun was recovered in violation of his Fourth Amendment rights, Jacobs relies on this court's opinions in *Stalling* and *Bridgewater*. In *Stalling*, investigating officers observed a young man who was known to be a truant standing on a street corner with a group of four to five other young men, one of whom was later identified to be Stalling. 713 N.E.2d at 923. The young men had congregated in an empty lot near the street corner and across the street from a local food mart. *Id.* The area was known to be a high crime area as it had been the site of a number of incidents of robbery, drug dealing, and gun shots being fired. *Id.* Given that it was around noon on a school day, the officers approached the suspected truant. As the officers approached, the suspected truant rode away on his bicycle and the rest of the group began to disperse. *Id.* One of the officers recognized Stalling from a previous investigation and observed him "move as if to place something into the waistband of his pants near the belt buckle." *Id.* The officer then confronted Stalling, who remained standing in front of the officer but did not say anything. *Id.* The officer approached Stalling and conducted a patdown search during which he found a plastic baggy containing two small rocks of cocaine. *Id.* Stalling was then arrested and charged with possession of cocaine. *Id.*

Stalling argued on appeal that all evidence relating to the bag containing the cocaine should have been excluded because it was recovered in violation of his Fourth Amendment rights. Upon review, this court concluded that the facts presented "would not cause an ordinarily prudent person to believe that criminal activity had or was about to occur." *Id.* at 925. In reaching this conclusion, the court stated that "merely looking suspicious is not sufficient to overcome Fourth Amendment protections against arbitrary and abusive police practices." *Id.* (internal citations omitted).

Likewise, in *Bridgewater*, officers were patrolling a high crime area at approximately 11:30 p.m. when the officers observed Bridgewater standing outside an apartment building talking with an older man and woman. *Bridgewater*, 793 N.E.2d at 1099.

> After observing the three people for several minutes, the officers drove by the building. Bridgewater ran inside the building, closed the door, and watched the officers from an upstairs window.
>
> After a few minutes, Bridgewater came back outside and continued to talk to the older man who remained outside. The officers then walked down the sidewalk toward the building. When the officers approached, Bridgewater looked at them and then ran inside the building again. The officers had talked to the older man for a few minutes when Bridgewater and another man came out of the building and walked past the officers.

*Id.* One of the officers then stopped Bridgewater, asked him why he had run when he saw them, and instructed Bridgewater to remove his hands from his

jacket pockets. *Id.* Bridgewater initially complied but then put his hands back in his pockets. *Id.* At that point, the officer decided to perform a pat-down search for weapons to ensure his safety. *Id.* While the officer was patting down Bridgewater's pants, he felt a large bag. *Id.* It was immediately apparent to the officer that the object was a bag of cocaine. *Id.* Bridgewater was then placed under arrest and a bag containing cocaine and marijuana was removed from his pants. *Id.*

[18] Bridgewater argued on appeal that all evidence relating to the bag containing the cocaine and marijuana should have been excluded because it was recovered in violation of his Fourth Amendment rights. Upon review, this court concluded that the State failed to demonstrate facts that the officers had the requisite reasonable suspicion of criminal activity to complete the investigatory search. *Id.* at 1103. In reaching this conclusion, the court stated the following:

> We recognize that the officers were watching the apartment building because of complaints about drug dealing and that the building was located in a high-crime-area. We also do not minimize the fact that Bridgewater twice fled into the building after seeing the officers. However, the officers did not observe any sort of transaction or interaction among Bridgewater and the other two people standing with him other than talking. He was not carrying anything unusual, nor was he doing anything else suspicious. The mere fact that he walked or ran from the police into the building is simply not enough to meet the State's burden in this case.

*Id.*

## 2. *The Instant Matter*

Upon review, we conclude that the circumstances are such that both *Bridgewater* and *Stalling* can be distinguished from the instant matter. The record reveals that at approximately 2:00 p.m. on September 2, 2015, Officer Smith observed "several juveniles who looked like they should be in school [like] they were school age." Tr. p. 7. Jacobs, who himself appeared to be a juvenile, was congregated with this group. Some members of the group were wearing red, a known gang color in the area, and Jacobs had a red shirt flung over his shoulder at some point. Officer Smith testified that he was watching the park because there had been reports of gang activity and juveniles engaging in gun violence. While watching the park, Officer Smith observed that Jacobs "and another juvenile" walked away quickly when the park ranger approached. Tr. p. 8. One could reasonably infer from this statement that Officer Smith believed that both Jacobs and the other individual were juveniles.

Furthermore, Officer Casavan testified that he responded to a call from Officer Smith who indicated that he had observed "several juveniles hanging out in the park during the day during school hours." Tr. pp. 20-21. Officer Casavan also testified that when he stopped Jacobs, "I still thought he was a juvenile." Tr. p. 25. In addition, Officer Casavan indicated that upon detaining Jacobs, he walked him over to the shelters "where the other juveniles had remained." Tr. p. 24. Again, one could reasonably infer from this statement that Officer Casavan believed that Jacobs was a juvenile.

In addition, while flight alone is not sufficient to establish reasonable suspicion of wrongdoing, it is a factor that could be considered. *See Bridgewater*, 793 N.E.2d at 1100. In fact, the Indiana Supreme Court has held that evidence of flight may be considered as circumstantial evidence of consciousness of guilt. *See Myers v. State*, 27 N.E.3d 1069, 1077 (Ind. 2015). The fact that Jacobs and another apparent juvenile left each time a law enforcement official approached the area could reasonably lead Officer Smith to believe that Jacobs and his cohort had a consciousness of guilt for being in the park at a time when they should have been in school.

Further, as is stated above, in determining whether an officer had reasonable suspicion of criminal or delinquent activity, the trial court should consider the totality of the circumstances. *See Stalling*, 713 N.E.2d at 924. This includes consideration of whether a defendant's actions were suspicious. *Id*. Jacobs's actions were indeed suspicious. Jacobs, who appeared to be a juvenile, was congregating for a relatively lengthy period of time with suspected gang members in a park during a time of day that juveniles should have been in school and was in possession of gang colors himself. Jacobs quickly left the area where the group was congregated whenever he observed law enforcement in the general vicinity, returned only after law enforcement had left the general vicinity, and increased his speed in leaving the area as law enforcement came closer. In addition, Jacobs failed to stop when initially ordered to do so by Officer Smith. On top of these facts, Jacobs and the group were congregated in a high crime area where there had been recent episodes of violence, *i.e.*, the

firing of gunshots by juveniles who were believed to be gang members. Upon review, we conclude that these facts are sufficient to establish reasonable suspicion that Jacobs was engaged in criminal activity. Jacobs failed to establish that the search of his person was conducted in violation of his rights under the Fourth Amendment.[3]

[23] In addition, review of the record further indicates that the search of Jacobs's person, which again occurred after the initial detention, was supported by reasonable suspicion. The record reveals that after the initial detention, Jacobs lied about being in possession of a weapon despite the fact that the outline of the weapon in his pocket was clearly visible. Because he could clearly see the outline of the weapon in Jacobs's pocket, Officer Casavan had reasonable suspicion to believe that Jacobs was armed despite his lie indicating otherwise.

# III. Article I, Section 11

[24] Jacobs alternatively argues that even if the search of his person was not conducted in violation of his Fourth Amendment rights, it was conducted in violation of his rights under Article I, Section 11.

---

[3] We note that to the extent that Jacobs relies on the Indiana Supreme Court's opinion in *Gaddie v. State*, 10 N.E.3d 1249 (Ind. 2014), for the proposition that he acted within his rights by continuing to walk away after being ordered to stop by Officer Smith, Jacobs's reliance on *Gaddie* is misplaced because we conclude that Officer Smith had reasonable suspicion to believe that Jacobs was committing the status offense of truancy when he stopped Jacobs. In *Gaddie*, the Indiana Supreme Court held that a person cannot be held criminally liable for walking away from a police officer when the officer stops the individual *without reasonable suspicion or probable cause*. 10 N.E.3d at 1254 (emphasis added).

# A. Legal Authority

Article I, Section 11 reads:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

"Although this language tracks the Fourth Amendment verbatim, we proceed somewhat differently when analyzing the language under the Indiana Constitution than when considering the same language under the Federal Constitution." *Trimble v. State*, 842 N.E.2d 798, 803 (Ind. 2006). "Instead of focusing on the defendant's reasonable expectation of privacy, we focus on the actions of the police officer, concluding that the search is legitimate where it is reasonable given the totality of the circumstances." *Id.* The State has the burden to demonstrate that the police intrusion was reasonable. *D.F.*, 34 N.E.3d at 690.

When reviewing whether the police intrusion was reasonable, we will consider the following factors in assessing reasonableness: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005). When considering the degree of intrusion, we consider the nature of the privacy interest upon which the search intrudes and the character

of the intrusion itself. *D.F.*, 34 N.E.2d at 690 (internal citation and quotation omitted). The degree of intrusion is viewed from the point of view of the defendant. *See Duran v. State*, 930 N.E.2d 10, 19 (Ind. 2010).

## B. Analysis

### *1. Degree of Concern, Suspicion, or Knowledge of Wrongdoing*

[27] Jacobs argues that the police intrusion was unreasonable because Officer Smith had little suspicion that criminal or delinquent activity was occurring. In making this argument, Jacobs acknowledges that many of the individuals congregated together appeared to be juveniles and were either wearing or in possession of gang colors but notes that the reported gang activity and gunfire had not occurred on the day in question. Moreover, Jacobs argues that because truancy is not a crime but rather a status offense, *see W.R.S. v. State*, 759 N.E.2d 1121, 1124 (Ind. Ct. App. 2001), the fact that a number of the individuals congregated appeared to be truant from school should not be found to be sufficient to reasonably lead one to suspect that criminal or delinquent activity had occurred. We disagree.

[28] Review of the record indicates that when Officer Smith arrived at the park, it appeared that a number of the individuals gathered were school-age juveniles who were truant from school. In addition, although it turned out that Jacobs was eighteen at the time he was arrested, Jacobs looked as if he were a juvenile, leading Officers Smith and Casavan to believe that he could have also been one of the individuals truant from school. The group, which again included Jacobs,

was congregated in a high-crime area with many of the individuals wearing or in possession of gang colors. There had been multiple recent police runs to the area because of reports of gunshots fired by juveniles who were suspected to be gang members. In addition, Jacobs and another apparent juvenile walked away from the group any time a law enforcement official approached. Jacobs also refused to stop when initially ordered to so do by Officer Smith. This flight could be considered circumstantial evidence that Jacobs and his cohort had a consciousness of guilt, *i.e.*, that they knew they should have been in school rather than in the park on the afternoon in question. *See Myers*, 27 N.E.3d at 1077. At the very least, this behavior was arguably suspicious and could have reasonably lead Officers Smith and Casavan to suspect that Jacobs and his cohort were hiding something.

[29] The totality of the circumstances are sufficient to give rise to a high degree of suspicion that criminal or delinquent activity was occurring or had just occurred. We will therefore consider this factor in the State's favor.

### 2. *Degree of Intrusion*

[30] Jacobs also argues that the police intrusion was unreasonable because the degree of intrusion upon him was high. The State acknowledges that the degree of intrusion was not minimal because the police instructed Jacobs to lie on the ground, handcuffed him, and then took him to the area where the rest of the group was located. We note, however, that while the degree of intrusion on Jacobs was undoubtedly high, the degree of the intrusion was increased because

of Jacobs's own actions, namely his failure to stop when instructed by Officer Smith to do so. We will nevertheless consider this factor in Jacobs's favor.

### 3. Law Enforcement Needs

Jacobs last argues that the law enforcement needs in the instant matter were minimal. We cannot agree. Officer Smith was sent to investigate possible gang activity in a high-crime area where there had been recent reports of gunshots being fired by potential gang members. It is reasonable to infer that the needs of law enforcement to protect the community by attempting to stop this repeated gun violence were great.

Further, Jacobs and his companions looked as if they could have been the suspected juvenile gang members who were believed to be responsible for the recent reports of gunshots fired. Many of those gathered were either wearing or in possession of gang colors. While Jacobs was not wearing the gang colors, at one point during Officer Smith's observation of the group Jacobs had a t-shirt matching the gang colors slung across his shoulder. Further, it appeared that at least some of those gathered were truant from school. Jacobs, himself, looked as if he could have been committing the status offense of truancy. In addition, Jacobs behaved in a suspicious fashion whenever law enforcement approached the vicinity where the group was gathered, indicating a possible consciousness of guilt. It is also of note that after the initial detention but before the search of Jacobs's person, Jacobs lied to Officer Casavan, who could clearly see the outline of the handgun in Jacobs's pocket as he walked Jacobs back to the rest of the group after restricting Jacobs but before placing him under arrest, about

whether he was in possession of a weapon. The facts support a finding that law enforcements needs were great. We will therefore consider this factor in the State's favor.

[33] Because we conclude that two of the three *Litchfield* factors should be considered in the State's favor, we further conclude the detention of Jacobs and the subsequent search of his person were not completed in violation of Jacobs's rights under Article I, Section 11.

# Conclusion

[34] Having concluded that the handgun in question was not recovered in violation of either the Fourth Amendment or Article I, Section 11, we conclude that the trial court did not abuse its discretion in admitting the handgun into evidence.

[35] The judgment of the trial court is affirmed.

Altice, J., concurs.

Crone, J., dissents with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jordan Jacobs,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | Court of Appeals Case No.<br>49A02-1601-CR-19 |

**Crone, Judge, dissenting.**

[36] In reversing a criminal defendant's conviction almost a century ago, the Indiana Supreme Court stated, "'Refusal to receive evidence when illegally seized tends to discourage the practice and thereby protects the innocent as well as the guilty from obnoxious and disgraceful invasions of their right to privacy and retains the Fourth Amendment and similar state constitutional provisions unimpaired.'" *Evans v. State*, 198 Ind. 487, 490, 154 N.E. 280, 281 (1926)

(quoting CORNELIUS ON SEARCH AND SEIZURE at 56).[4]  In this case, Jacobs is undeniably guilty of carrying a handgun without a license.  But in holding that the police did not invade his right to privacy by ordering him to the ground and handcuffing him based on a tenuous suspicion of truancy, the majority has impaired the Fourth Amendment and Article 1, Section 11 of the Indiana Constitution for innocent Hoosiers who wish to exercise their constitutional right to walk away from approaching officers who have no valid reason to detain them.  *See Gaddie v. State*, 10 N.E.3d 1249, 1254 (Ind. 2014) ("A person approached by police 'need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.  He may not be detained even momentarily without reasonable, objective grounds for doing so ….'") (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)).[5]

## Fourth Amendment

[37]  "The Fourth Amendment to the U.S. Constitution protects persons from unreasonable search and seizure by prohibiting, as a general rule, searches and

---

[4] *See also Minnesota v. Carter*, 525 U.S. 83, 109 (1998) ("If the illegality of the activity made constitutional an otherwise unconstitutional search, such Fourth Amendment protection, reserved for the innocent only, would have little force in regulating police behavior toward either the innocent or the guilty.") (Ginsburg, J., dissenting); *United States v. Quinn*, 751 F.2d 980, 981 (9th Cir. 1984) ("The Fourth Amendment protects the guilty because only by doing so can the innocent be protected.  The innocent are not mere incidental beneficiaries of an amendment designed to protect the guilty.  The innocent are its primary beneficiaries; the reasonableness of any expectation of privacy should be ascertained from their standpoint.") (Sneed, J., dissenting), *cert. dismissed* (1986).

[5] *See also Olmstead v. United States*, 277 U.S. 438, 478 (1928) ("The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness.…  They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.") (Brandeis, J., dissenting).

seizures conducted without a warrant supported by probable cause." *Clark*, 994 at 260. "When a defendant challenges a warrantless search, it is the State's burden to prove the search fell within an exception to the warrant requirement." *J.K. v. State*, 8 N.E.3d 222, 228 (Ind. Ct. App. 2014). A person may be detained without a warrant on less than probable cause if the officer has a justifiable suspicion that "the suspect has committed a crime, providing the intrusiveness and nature of the seizure is 'reasonably related in scope to the justification for [its] initiation. The officer must be able to point to specific and articulable facts which reasonably warrant the intrusion upon the individual's right of privacy.'" *Manigault v. State*, 881 N.E.2d 679, 685 (Ind. Ct. App. 2008) (alteration in *Manigault*) (quoting *Terry*, 392 U.S. at 21). "Reasonable suspicion entails at least a minimal level of objective justification that is more than an unparticularized suspicion or hunch." *Pugh v. State*, 52 N.E.3d 955, 964-65 (Ind. Ct. App. 2016), *trans. denied*. "Even if justified, a reasonable suspicion only permits the officer to temporarily freeze the situation for inquiry and does not give him all the rights attendant to an arrest." *Burkett v. State*, 736 N.E.2d 304, 306 (Ind. Ct. App. 2000).

[38] The only arguably relevant facts that Officers Smith and Casavan were able to articulate as a basis for invading Jacobs's privacy are that he appeared to be a juvenile who should have been in school that afternoon,[6] walked away from

---

[6] Officer Smith did not specifically state that Jacobs himself appeared to be a juvenile; he merely referred to Jacobs "and *another* juvenile[,]" apparently implying that Jacobs also was a juvenile, which he was not. Tr. at 8 (emphasis added).

two marked vehicles that approached him, and disregarded Officer Smith's order to stop. Officer Smith was conducting surveillance based on reports that allegedly gang-affiliated juveniles wearing red clothing had fired gunshots in the area several days earlier. He watched Jacobs for several hours and saw nothing to indicate that Jacobs had a gun or was engaging in any gang-related or criminal activity. Jacobs wore no red clothing that day,[7] nor did he flee from the park ranger or the police officers. Instead, Jacobs merely walked quickly away from them, which was his constitutional right as well as an understandable response in light of well-publicized encounters between law enforcement authorities and other young African-American males. This Court has previously stated that "[t]he color of one's skin, the neighborhood one happens to be in, and the fact that one turns away from the police are not sufficient, individually or collectively, to establish a reasonable suspicion of criminal activity." *Tumblin v. State*, 664 N.E.2d 783, 785 (Ind. Ct. App. 1996) (citing *Williams v. State*, 477 N.E.2d 96, 99 (Ind. 1985)).[8]

[39] Under the Fourth Amendment, "[t]he baseline rule is that a search or seizure is ordinarily unreasonable absent *individualized* suspicion of criminal activity."

---

[7] Officer Smith testified only that Jacobs had a red t-shirt slung over his shoulder for an unspecified length of time. There is no evidence that Jacobs owned the t-shirt or had it in his possession when the officers stopped him.

[8] The majority finds it "suspicious" that "Jacobs, who appeared to be a juvenile, was congregating for a relatively lengthy period of time with suspected gang members in a park during a time of day that juveniles should have been in school …." Slip op. at 14. Under that logic, the same could be said for the same group of juveniles waiting on a school bus in that neighborhood.

*State v. Gerschoffer*, 763 N.E.2d 960, 964 (Ind. 2002) (emphasis added) (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)). "[M]erely 'looking suspicious' is not sufficient to overcome Fourth Amendment protections against arbitrary and abusive police practices." *Stalling*, 713 N.E.2d at 925 (quoting *Tumblin*, 664 N.E.2d at 784). At most, the officers reasonably could have suspected that Jacobs was truant from school, which is a status offense, not a criminal offense.[9] The State cites no caselaw holding that this suspicion was a constitutionally permissible reason for stopping Jacobs to investigate, but assuming for argument's sake that it was, the stop should have been no more intrusive than asking him for identification to determine his age. At that point, the officers had no reason to fear for their safety and no individualized suspicion that Jacobs had committed a crime or possessed a weapon of any kind. Nevertheless, they ordered Jacobs to the ground and handcuffed him.

[40] The U.S. Supreme Court has stated that "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). I am doubtful that any seizure of Jacobs was lawful under the totality of the circumstances, but I am convinced that the overly forceful manner of its execution unreasonably infringed his Fourth Amendment right to

---

[9] The officers did not testify as to how old they believed Jacobs to be. With certain limited exceptions for those at least sixteen years of age, students are required to attend school until they either graduate or turn eighteen, whichever occurs first. Ind. Code § 20-33-2-6.

be secure from unreasonable seizures.[10]  Jacobs's handgun was obtained as a direct result of this illegality and therefore should have been excluded as fruit of the poisonous tree.  *See, e.g.*, *Wilson v. State*, 754 N.E.2d 950, 956 (Ind. Ct. App. 2001) (explaining fruit of the poisonous tree doctrine).[11]

# Article 1, Section 11

[41]  The purpose of Article 1, Section 11 of the Indiana Constitution "is to protect from unreasonable police activity those areas of life that Hoosiers regard as private.  This provision must receive a liberal construction in its application to guarantee the people against unreasonable search and seizure."  *Perez v. State*, 981 N.E.2d 1242, 1251 (Ind. Ct. App. 2013) (citation omitted), *trans. denied*.  I respectfully disagree with the majority's determination that the officers' conduct in this case was reasonable under the three-part *Litchfield* analysis.

[42]  First, the officers' degree of concern, suspicion, or knowledge that Jacobs had committed a violation of any kind was low.  At most, he appeared to be a juvenile who should have been in school, and he walked away from marked vehicles and disregarded Officer Smith's order to stop; as an adult who was

---

[10] "[P]lacing a person in handcuffs may convert an investigatory stop into an arrest depending upon the totality of the circumstances."  *Reinhart v. State*, 930 N.E.2d 42, 46 (Ind. Ct. App. 2010).  It is unnecessary to determine whether handcuffing Jacobs converted his stop into an arrest, but assuming that it did, the arrest would have been illegal due to a lack of probable cause that he committed an offense of any kind.  *Cf. State v. Stevens*, 33 N.E.3d 1200, 1204-05 (Ind. Ct. App. 2015) ("Probable cause to arrest exists where the facts and circumstances within the knowledge of an officer are sufficient to warrant a belief by a person of reasonable caution that an offense has been committed and that the person to be arrested committed it."), *trans. denied*.

[11] Any suggestion that the officers would have seen Jacobs's handgun in his pocket during a less intrusive seizure is pure speculation.

unaware of the officers' suspicions that he was a truant, Jacobs reasonably thought that he had every right to do this. He may have been in a high-crime area near suspected gang members and truant juveniles, but the officers never saw him engage in any gang-related or criminal activity and never suspected that he had a weapon until after they seized and handcuffed him.

[43] Second, the majority properly concedes that the degree of police intrusion was high, although it unfairly blames him for the amount of force used to subdue him. Instead of briefly detaining Jacobs and asking him for proof of age to dispel their suspicions of truancy, the officers ordered him to the ground and handcuffed him. This was unnecessary and unreasonable.

[44] And third, the extent of law enforcement needs in this case was minimal. Officer Smith was on the lookout for suspected gang members wearing red clothing who had allegedly fired gunshots in the apartment complex several days earlier. He had no prior contact with Jacobs, who was not wearing red, did not appear to have a gun, and did not engage in any gang-related or criminal activity during the several hours of police surveillance. At most, Jacobs appeared to be a truant juvenile who had walked away from two marked vehicles, which would be understandable for someone guilty of a status offense (which he was not) as well as prudent for any young African-American male

who wished to avoid a confrontation with law enforcement.[12] I find it both interesting and troubling that after watching the people in the park for several hours and observing no criminal activity, Officer Smith suddenly became concerned that some of them might be truant from school. His alleged concern about truancy is undercut by the fact that he waited until after regular school hours to apprehend them.[13]

[45] In my view, the balance of these factors weighs decisively in Jacobs's favor, and therefore his seizure was unreasonable under Article 1, Section 11 of the Indiana Constitution. The trial court should have excluded the handgun that was obtained as a result of the unconstitutional seizure. *See Webster v. State*, 908 N.E.2d 289, 293 (Ind. Ct. App. 2009) (acknowledging exclusionary rule under Indiana Constitution), *trans. denied*. Consequently, I would reverse Jacobs's misdemeanor conviction for carrying a handgun without a license.

---

[12] In concluding its *Litchfield* analysis, the majority gratuitously notes that Jacobs lied to Officer Casavan about having a handgun in his pocket. This fact is irrelevant to the reasonableness of Jacobs's seizure under the Indiana Constitution.

[13] Therefore, it likely would have been impossible for the officers to comply with the dictates of Indiana Code Section 20-33-2-3 if Jacobs had actually been truant. *See* Ind. Code § 20-33-2-23 (providing that police officer "may take into custody any child … who is required to attend school … and … is found during school hours … in a public place …. [T]he officer shall immediately deliver the child to the principal of the … school in which the child is enrolled."). The circumstances surrounding the stop militate heavily in favor of a finding that it was pretextual.